# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

JARROD ROBERTS,

     Petitioner,

v.                                                          Case No. 1:21-cv-152-AW-MJF

RICKY D. DIXON,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner Jarrod Roberts, proceeding *pro se*, has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. Doc. 1. Respondent ("the State") answered, providing relevant portions of the state court record. Doc. 16. Roberts replied. Doc. 25. The undersigned concludes that no evidentiary hearing is required for the disposition of this matter, and that Roberts is not entitled to habeas relief.[1] Roberts's "Motion for Judicial Notice," Doc. 20, also should be denied.

_____

[1] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

## I. Factual Background and Procedural History[2]

This case concerns Roberts's conviction for sexual battery of a 22-year-old woman in the early morning hours of April 4, 2015. The victim, R.M., was a foreign exchange student from the Netherlands attending the University of Florida. R.M. met Roberts the night before the assault, as she was walking home from a night out with friends. R.M. encountered Roberts on the sidewalk. A brief conversation ensued, and R.M. agreed to ride to Roberts's home on the back of his motor scooter. At Roberts's home, R.M. and Roberts went to Roberts's bedroom and "start[ed] kissing, making out." Doc. 16, Ex. 2 at 53.[3] R.M. was wearing a dress, tie-on shorts, underwear, a bra and tennis shoes. While in Robert's bedroom, R.M. removed her shoes, partially unzipped the back of her dress, and removed her shorts and bra. R.M. did not remove her underwear.

Roberts asked R.M. if she was on birth control. Roberts's question concerned R.M. because she thought it indicated he was interested in having "unprotected" sexual intercourse. Roberts's question changed R.M.'s mood:

---

[2] The facts are drawn from the evidence presented at trial, viewed in the light most favorable to the State. *See* Doc. 16, Exs. 2-4 (Trial Tr.); *see also Jackson v. Virginia*, 443 U.S. 307 (1979).

[3] Hereafter, citations to the state-court record are to the electronically-filed exhibits attached to the State's answer, Doc. 16. The court cites the exhibit number followed by the page number of the original document.

A [R.M.]    It changed the atmosphere. I really didn't like the question. I was annoyed by it. And at that point I had kind of a reality check, like, What am I doing here? I need to go camping the next day. What am I doing? I don't know this guy. I just went with him on a scooter. How stupid of me.

Q [Prosecutor]    Okay. Have you decided at this point that you're done hooking up with him?

A    Yes.

Q    Have you decided at this point you're going to leave?

A.    Yes.

Q    And have you decided at this point that you're going to tell the defendant that you're done hooking up with him and you're going to leave?

A    Yes.

Q    As best you remember, how did you communicate to the defendant that this was over, you were leaving?

A    I said I was sorry but that I wanted to go home, that it was a stupid idea. I told him just to forget about it, and I wanted to go home.

Ex. 2 at 59-60.

R.M. zipped up her dress, put her shorts and shoes back on, got her purse, and walked outside the house onto Roberts's front porch. R.M. still was wearing her underwear. Roberts followed R.M. R.M. realized that she left her cell phone behind in Roberts's bedroom. R.M. started to go back inside the house to retrieve her phone,

but Roberts refused her entry. Roberts left R.M. on the front porch and went back inside. R.M. assumed that Roberts was retrieving her phone.

After waiting a few minutes on the porch, R.M. began knocking loudly on the front door to get Roberts's attention. Roberts came to the front door but was angry with R.M. for making noise. Roberts told R.M. that he did not find her phone.

R.M. "started to panic." Ex. 2 at 65. R.M. explained: "I'm not sure where I am. And without the phone I cannot call a taxi or call someone to pick me up or go on internet on Google maps to see where I am." *Id*. at 65.

Having no other option, R.M. set off on foot in the hope she would "see some landmarks or streets that I know of or see someone that can . . . call a taxi for me." *Id*. at 65. R.M. reached a street she recognized, but was upset and crying over the loss of her cell phone. R.M. then realized that Roberts had been following her.

Roberts's demeanor had changed and he no longer appeared angry. Roberts offered to take R.M. back to his house to get her phone. R.M. described that she was "[p]retty relieved," explaining:

> I thought, Okay. This is good. I know, kind of, where I am. I mean, I saw Main Street. If I can just get my phone back, I can walk home, and then I'm good.

*Id*. at 67.

R.M. and Roberts began walking together. R.M. presumed they were walking back to Robert's home. As they walked, however, Roberts became "touchy," grabbing R.M.'s hip and putting his arm around her. *Id*. at 67-68. Roberts then announced to R.M. that she "need[ed] to do something in order to get [her] phone back." *Id*. at 68. At trial, R.M. could not recall Roberts's precise demand, but she recalled that it was sexual in nature. R.M. decided that her phone was not worth that price. *Id*. at 68 ("If I can only get the phone by doing something in exchange for it, then forget the phone. Then I just want to go home.").

Roberts's demand frightened R.M., so she approached a parked car, knocked on the driver's window, and asked the driver for help. The driver drove off. R.M. saw a bicyclist and asked him for help, but he rode off.

R.M.'s attempts to seek help angered Roberts. Roberts ordered R.M. to stop asking for help, threatened her, and forced her to walk with him by grabbing her shoulders and the sides of her body. Roberts forced R.M. into a dark area (a recessed driveway adjacent to an abandoned building), forced her to her knees, and demanded that she perform fellatio on him. Although R.M. did not want to perform fellatio, she did so; Roberts threatened R.M. that if he did not become erect "it wouldn't be good for [her]." *Id*. at 72-73.

At one point R.M. tried to get up from her knees but Roberts grabbed her by the neck and forced her back down. R.M. described:

> A    He [Roberts] says I shouldn't walk away. I remember him saying something about, I will never to see light in my eyes again.
>
> Q [Prosecutor]    Okay. I just want to be clear. When you tried to get away and he forced you back down, you said he told you would never see the light of day again if you tried to get away?
>
> A    Yeah, something with light in my eyes, yes.
>
> Q    What did you do?
>
> A    I continued to give him the blowjob.
>
> Q    What are you thinking at this point?
>
> A    I could think pretty clear. I was – I was thinking about, Will I die tonight, or is there a way that I can walk away? Is there another attempt to flight?

*Id*. at 74. R.M. thought that "the best chance of surviving" was to continue performing fellatio on Roberts. *Id*. at 85.

After a while, Roberts pushed R.M. onto her back, laid on top of her, removed her shorts and underwear, and raped her. R.M. saw a police car approach. The officer (Maresca) shined a spotlight on Roberts and R.M. At trial, Maresca described that when he spotted the pair, R.M. was on her back with Roberts on top of her lying between her legs. Roberts was wearing a black tank top, silver shorts, black socks and flip flops. When the spotlight hit them, Roberts ran off and climbed over a chain-

Page 6 of 78

link fence topped with barbed wire. As Roberts scaled the fence, his flip flops fell to the ground.

R.M. ran to Officer Maresca. R.M. was crying and begging for help. R.M. told Maresca that she was attacked and raped. R.M. described Roberts physically (she did not know his real name), described his blue motor scooter, and described the general area where Roberts lived. When Maresca indicated that he would search for Roberts on foot, R.M. begged Maresca not to leave her alone out of fear that Roberts would return and harm her. Maresca then drove R.M. around the area to try to locate Roberts or his home. After their search was unsuccessful, Maresca drove R.M. to a hospital.

In the meantime, Roberts ran home and retrieved R.M.'s cell phone from his bedroom. After destroying the battery, Roberts wiped the cell phone with a tissue and wrapped it in the tissue to avoid leaving fingerprints. Roberts then ran back to the scene of the sexual battery and placed R.M.'s cell phone in the grass. When the police found R.M.'s cell phone, it still was wrapped in the tissue. The tissue had Roberts's blood on it.

The police combed the area to try to identify the assailant's house. They zeroed in on Robert's house when they saw his blue motor scooter outside, a pair of heavily soiled black socks on the porch, and blood on the front door knob. The police

found Roberts in his bedroom. Roberts was in his underwear. His dark tank top and silver shorts were lying nearby. Roberts had scratches on his face, hands and wrists. Roberts revealed that a girl from the Netherlands had been in his room that night and that she lost her cell phone. Roberts handed the police R.M.'s underwear. The police found the back of R.M.'s cell phone in Roberts's bathroom. R.M. had never been in Roberts's bathroom.

A doctor examined R.M. at the hospital. R.M. had redness around her neck, an abrasion on her left shoulder and an abrasion to her clavicle consistent with someone putting his hands forcefully around her neck and shoulders. R.M. also had skin redness on her back consistent with having been on the ground on her back. R.M. also had abrasions on both knees consistent with being forced to the ground onto her knees. R.M. had redness on her cervix consistent with forced penile penetration of her vagina.

In Alachua County Circuit Court Case Number 2015-CF-001165, Roberts was charged with Sexual Battery by Threat of Force or Violence. Ex. 1. R.M. traveled from the Netherlands to Gainesville to testify at Roberts's trial. Roberts's defense was that R.M. consented to all of the sexual activity.

The jury found Roberts guilty as charged. Ex. 4 at 517. The jury made specific findings that during the crime: (1) Roberts's penis had contact with R.M.'s vagina,

(2) Roberts's penis penetrated R.M.'s vagina, (3) Roberts's penis had contact with R.M.'s mouth, and (4) Roberts's penis penetrated R.M.'s mouth. Ex. 4 at 517-18.

The trial court adjudicated Roberts guilty and sentenced him to 30 years of imprisonment. Ex. 5. On November 29, 2017, the Florida First District Court of Appeal ("First DCA") affirmed the judgment and sentence *per curiam* without written opinion. *Roberts  v. State*, No. 1D16-3309, 237 So. 3d 272 (Fla. 1st DCA 2017) (Table) (copy at Ex. 8).

On February 16, 2018, Roberts filed a *pro se* petition for writ of habeas corpus in the state circuit court claiming that there was insufficient evidence to support his conviction. Ex. 9. The state circuit court construed the petition as a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, and summarily denied the claim as procedurally barred. Ex. 10. The First DCA affirmed *per curiam* without written opinion. *Roberts v. State*, No. 1D18-1567, 268 So. 3d 105  (Fla. 1st DCA 2019) (Table) (copy at Ex. 13). Roberts filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court. Ex. 13. The Florida Supreme Court dismissed the case for lack of jurisdiction. *Roberts v. State*, No. SC19-788, 2019 WL 2181176 (Fla. May 16, 2019) (copy at Ex. 13).

On July 1, 2019, Roberts filed another *pro se* petition for writ of habeas corpus in the state circuit court asserting four claims. Ex. 14. On July 15, 2019, the state

circuit court construed the petition as a second Rule 3.850 motion and summarily denied relief. Ex. 15. The court found that two claims were not cognizable in a Rule 3.850 motion, and that the other two claims lacked merit. *Id*. Roberts did not appeal.

On September 23, 2019, Roberts filed a third *pro se* Rule 3.850 motion, asserting one claim. Ex. 17. On October 7, 2019, the state circuit court summarily denied relief. Ex. 18. In addition, the state circuit court sanctioned Roberts for (1) filing a Rule 3.850 motion in bad faith with reckless disregard for the truth; (2) attempting to commit a fraud upon the court by alleging under oath false statements of material fact; and (3) abusing the legal process. Ex. 20. The First DCA affirmed in a written opinion. *Roberts v. State*, No. 1D19-4086, 306 So. 3d 1188 (Fla. 1st DCA 2020) (copy at Ex. 21). On March 19, 2021, the Florida Supreme Court declined to accept jurisdiction and denied Roberts's petition for review. *Roberts v. State*, No. SC21-12, 2021 WL 1081410 (Fla. Mar. 19, 2021) (copy at Ex. 21).

On November 7, 2019, Roberts filed a *pro se* petition in the First DCA alleging ineffective assistance of appellate counsel. Ex. 22. The First DCA denied the petition on the merits. *Roberts v. State*, No. 1D19-4087, 303 So. 3d 990 (Fla. 1st DCA 2020) (copy at Ex. 25). On December 18, 2020, the Florida Supreme Court declined to accept jurisdiction and denied Roberts's petition for review. *Roberts v. State*, No. SC20-1521, 2020 WL 7419103 (Fla. Dec. 18, 2020) (copy at Ex. 25).

Roberts filed his *pro se* federal habeas petition on September 22, 2021. Doc. 1. The petition raises nine claims, including trial court error, ineffective assistance of trial counsel and ineffective assistance of appellate counsel. The State asserts that Roberts is not entitled to habeas relief because he procedurally defaulted several claims, and he fails to satisfy § 2254(d)'s demanding standard for the claims he properly exhausted. Doc. 16.

## II. RELEVANT LEGAL STANDARDS

### A.  Federal Habeas Exhaustion Requirement and Procedural Default

"To respect our system of dual sovereignty, the availability of habeas relief is narrowly circumscribed." *Shinn v. Ramirez*, 596 U.S. ___, 142 S. Ct. 1718, 1730 (2022) (citations omitted). One such constraint is the exhaustion requirement and corollary principle of procedural default. *See* 28 U.S.C. § 2254(b); *Shinn*, 142 S. Ct. at 1731-32.

Section 2254 "requires state prisoners to 'exhaust the remedies available in the courts of the State' before seeking federal habeas relief." *Shinn*, 142 S. Ct. at 1732 (alteration adopted) (quoting 28 U.S.C. § 2254(b)(1)(A)). "To satisfy the exhaustion requirement, the petitioner must have fairly presented the substance of his federal claim" to the state's highest court, either on direct appeal or on collateral review. *Picard v. Connor*, 404 U.S. 270, 277-78 (1971); *Castille v. Peoples*, 489

U.S. 346, 351 (1989); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

"Although the exhaustion requirement's 'broad principles are relatively clear,' the minimum requirements that a habeas petitioner must meet in order to exhaust his remedies are not." *Pride v. Fla. Dep't of Corr.*, No. 19-14284, 2021 WL 6123916, at *2 (11th Cir. Dec. 28, 2021) (citing *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (noting that "many courts have struggled to pinpoint the minimum requirements" for exhaustion)). "To 'fairly present' a claim, the petitioner is not required to cite 'book and verse on the federal constitution.'" *Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1352 (11th Cir. 2012) (quoting *Connor*, 404 U.S. at 278). Nevertheless, the claim that the prisoner presents to the state court must allow "a reasonable reader [to] understand each claim's particular legal basis and specific factual foundation." *McNair*, 416 F.3d at 1302 (internal quotation marks and citation omitted).

A petitioner can indicate the federal-law basis for his claim "by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"

*Baldwin v. Reese*, 541 U.S. 27, 32 (2004); *Jimenez v. Fla. Dep't of Corr*., 481 F.3d 1337, 1342 (11th Cir.2007) ("[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues."). But a habeas petitioner does *not* exhaust his state remedies "by merely (1) going through the state courts; (2) presenting to the state courts all the facts necessary to support the federal claim; or (3) presenting to the state courts a '*somewhat* similar state-law claim.'" *Pride*, 2021 WL 6123916, at *2  (emphasis adopted) (quoting *McNair*, 416 F.3d at 1302).

When a petitioner fails to exhaust his federal claim in state court and the state court remedy no longer is available, that failure to exhaust is a procedural default. *Boerckel*, 526 U.S. at 839-40, 848; *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (federal habeas courts should enforce applicable state procedural bars even as to claims that were never presented to the state courts); *see also Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999) (when a petitioner fails to properly exhaust a federal claim in state court, and it is obvious that the unexhausted claim now would be procedurally barred under state law, the claim is procedurally defaulted). A claim also is procedurally defaulted—even if it was presented in state court—if the state court rejected the claim on an adequate state ground independent of the federal question, such as a state-law procedural bar or default. *See Coleman*

*v. Thompson*, 501 U.S. 722, 734-35 & n.1 (1991); *Caniff v. Moore*, 269 F.3d 1245,

1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted

under state law cannot be addressed by federal courts.").

> Together, exhaustion and procedural default promote federal-state comity. Exhaustion affords States an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights, and procedural default protects against the significant harm to the States that results from the failure of federal courts to respect state procedural rules. Ultimately, it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without giving an opportunity to the state courts to correct a constitutional violation, and to do so consistent with their own procedures.

*Shinn*, 142 S. Ct. at 1732 (alteration adopted) (internal quotation marks and citations

omitted). Thus, "only rarely may a federal habeas court hear a claim or consider

evidence that a prisoner did not previously present to the state courts in compliance

with state procedural rules." *Shinn*, 142 S. Ct. at 1730.

## B.    <u>Standard for Excusing a Procedural Default</u>

"[F]ederal courts may excuse procedural default only if a prisoner 'can

demonstrate cause for the default and actual prejudice as a result of the alleged

violation of federal law.'" *Shinn*, 142 S. Ct. at 1732 (quoting *Coleman*, 501 U.S. at

750). To establish cause, "the prisoner must 'show that some objective factor

external to the defense impeded counsel's efforts to comply with the State's

procedural rule.'" *Shinn*, 142 S. Ct. at 1732 (quoting *Murray v. Carrier*, 477 U.S.

Page 14 of 78

478, 488 (1986)). To demonstrate prejudice, "the prisoner must show not merely a substantial federal claim, . . . but rather that the constitutional violation worked to his *actual* and substantial disadvantage." *Shinn*, 142 S. Ct. at 1732 (internal quotation marks and citations omitted).

C.    **Section 2254 Standard of Review**

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[4] Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[4] Unless otherwise noted, references to Supreme Court's *Williams* case are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403-13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

529 U.S. at 412-13 (O'Connor, J., concurring). In applying the "unreasonable application" clause, the federal court defers to the state court's reasoning unless the state court's application of the governing legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court warned that, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102.

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause of § 2254(d)(1), the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA is not whether a federal court believes the state court's determination was

Page 16 of 78

incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has emphasized often that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, <u>a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement</u>.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, however, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

### III.   DISCUSSION

**Ground One**     **"The Lower Court Erred in Unduly Restricting Cross Examination of the Accuser as to Credibility and Motive." Doc. 1 at 3.**

Roberts claims that the trial court violated his "due process rights under the 4th, 5th, 6th, 8th and 14th Amendments" when it "prohibited the cross examination of the alleged victim." Doc. 1 at 3-4. Roberts asserts that he exhausted this claim by presenting it in his direct appeal. *Id*. at 3. Roberts's initial brief on direct appeal summarized the issue as follows:

> The lower court erred in limiting the defense cross examination of the accuser as to her need to maintain good behavior in order to keep her student visa and to remain in the United States. Such limitation violates the fundamental Sixth Amendment right to confront and cross examine one's accuser, and to test bias and motivations to testify. As this case hinged almost entirely upon the credibility of the accuser, such limitation prohibited Mr. Roberts from receiving a fair trial.

Ex. 6 at 17; *see also id.* at 19-21 (Arg.).

Page 18 of 78

The State maintains that to the extent Roberts's habeas claim can be construed as raising a *federal constitutional* claim—as opposed to a state-law issue—the claim is procedurally defaulted. The State acknowledges that Roberts's direct appeal brief referenced the Sixth Amendment's right of confrontation, and that Roberts also cited *Davis v. Alaska*, 415 U.S. 308, 316 (1974). The State argues, though, that this was merely a passing reference and that Roberts's substantive argument was grounded in state law. Doc. 16 at 43-44.

The District Court need not decide the exhaustion issue, because even assuming to Roberts's benefit—without deciding—that his direct appeal brief fairly apprised the First DCA that the alleged restriction on cross-examination violated his Sixth-Amendment right to confront and cross-examine his accuser, Roberts is not entitled to habeas relief.

**A.    *The State Court's Decision is Subject to § 2254(d)'s Deferential Standard of Review***

The First DCA affirmed Roberts's conviction without explanation. Ex. 8. The First DCA's summary affirmance is an "adjudication on the merits" of Roberts's claim and, therefore, is subject to § 2254(d)'s deferential standard of review. *See Richter*, 562 U.S. at 100 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

**B.    *Clearly Established Federal Law***

"The Sixth Amendment, applicable to the States through the Fourteenth Amendment, guarantees a criminal defendant 'the right . . . to be confronted with the witnesses against him.'" *Al-Amin v. Warden Georgia Dep't of Corr.*, 932 F.3d 1291, 1302 (11th Cir. 2019) (quoting U.S. Const. amend. VI). "A court violates the Confrontation Clause when it inappropriately restricts the scope of cross-examination." *Al-Amin*, 932 F.3d at 1302 (citing *Delaware v. Fensterer*, 474 U.S. 15, 19 (1985), *Davis*, 415 U.S. at 316-18). Trial judges, however, "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

**C.    *Roberts Is Not Entitled to Habeas Relief***

At the outset, it bears noting that Roberts's federal habeas petition alleges that the trial court "prohibited the cross examination of the alleged victim." Doc. 1 at 3. This blanket allegation is refuted by the record. At trial, defense counsel extensively cross-examined R.M. *See* Ex. 2 at 86-108.

To the extent Roberts seeks habeas relief on the same claim he raised on direct appeal—*i.e.*, that the trial court *improperly limited* cross-examination as to R.M.'s "need to maintain good behavior in order to keep her student visa and to remain in the United States"—Roberts is not entitled to relief because he fails to satisfy § 2254(d)(1)'s demanding standard. Defense counsel's question arose in this context.

Defense counsel cross-examined R.M. extensively on the events of the evening in question to attempt to discredit her testimony that the fellatio and sexual intercourse was nonconsensual and by force or threat. Ex. 2 at 86-108. During cross-examination, the prosecutor made only two objections.

First, when defense counsel asked R.M.—for the second time—whether she had been sexually attracted to Roberts earlier in the evening (and R.M. responded affirmatively for the second time), the prosecutor objected, "this has been asked and answered." Ex. 2 at 92. The trial court responded: "Give him some room," and instructed defense counsel: "You may proceed." *Id*. at 93. Defense counsel immediately asked the question a third time, and R.M. responded affirmatively, for the third time. *Id*. at 91, 92, 93.

The second objection occurred when defense counsel was questioning R.M. about Officer Maresca's arrival on the scene:

Q [Defense Counsel Martin]    Okay. Now, you became aware of another person's presence that was a law enforcement officer by a bright, shining light.

A [R.M.]    Yes.

Q    All right. And at some – before you spoke to the officer, you saw this – you know it was an officer because he was wearing a uniform.

A    I saw it was a police car, yeah.

Q    So you saw a police car. Did you see the policeman?

A    I saw a figure stepping out of it.

Q    At any point – when did you realize the figure was a human being that was in the occupation of a police officer?

A    As soon as – I mean, I assumed it because there was a figure stepping out of the police car, but, or course, when I ran towards him, I saw it was an officer clothed in a police –

Q    But you were clear –

A    -- uniform.

Q    I'm sorry ma'am. I didn't mean to interrupt you.

A    In a police uniform.

Q    All right. So you were clear that this was a police officer because you saw the police vehicle.

A    Yes.

Q    All right. And it didn't take you any time whatsoever to make that conclusion in your mind.

A        I'm sorry?

Q        This was not a long process that you had to go through to see the police car to determine, yes, this figure coming to me must be a police officer.

A        Yeah. I mean, that's, of course, what you assume, yeah, if there's someone stepping out.

Q        And you're aware of what law enforcement officers do. They enforce the law.

A        Yes.

Q        And part of what they do is arrest people, correct?

A        Yeah. That's part of their job, I believe, yeah.

Q        And, generally, when they arrest people it's for criminal activity.

A        Correct.

Q        All right. Now, at the onset of your direct testimony here, you indicated that you are from the Netherlands.

A        Correct.

Q        All right. So – and that you're here on a foreign exchange program.

A        Yeah. Last year I was, yeah.

Q        All right. So you're here on a student visa.

A        Yes.

Q        All right. So you're not a citizen.

A     I'm not a citizen?

Q     Of the United States?

A     Correct, I don't have a United States nationality.

Q     All right. So you had to apply to the University of Florida.

A     Yeah, I had to apply to my university back home, and then they nominated me for going to the University of Florida.

Q     So you had to meet certain standards.

A     Yes.

Q     I mean, good grades, good conduct, that type of thing.

A     A good what?

Q     Good conduct.

A     Conduct? What –

Q     Yeah, that you behave yourself appropriately.

     MR. OWEN [Prosecutor]:    Your Honor, I'm going to object. He's asking for speculation.

     THE COURT:    Sustained.

BY MR. MARTIN:

Q     So you're aware that police officers –

     MR. MARTIN:    You're Honor, may I speak to that?

     THE COURT:    No.

MR. MARTIN:      Yes sir.

BY MR. MARTIN:

Q      You're aware of what a law enforcement officer does, correct?

A      Yes.

Q      All right. And here you are – at least circumstantially you're engaged in a sex act.

A      What do you mean by engaged in a sex act?

Q      You're performing oral sex.

A      Correct, yeah, I had performed oral sex that evening.

Q      And this is not in the privacy of your home.

A      Correct.

Q      All right. Were you concerned about the possibility of you being arrested?

A      No. I was just really happy to see the police car.

Q      Were you concerned about the possibility of this being some sort of violation of your student visa?

A      No.

*Id*. at 103-07.

When Roberts challenged the trial court's ruling on direct appeal, he maintained that the disallowed question was essential to "test for a possible motive for fabrication," specifically, "[t]hat [R.M.] herself could have been arrested and

Page 25 of 78

charged with disorderly conduct, indecent exposure, or perhaps even making a false report to law enforcement, and that could have impacted her ability to stay in school in the United States." Ex. 6 at 21.

The state trial judge reasonably determined that defense counsel's question called for R.M. to speculate. Based on this determination, a fairminded jurist could agree with the First DCA's conclusion that no constitutional error occurred. *See Al-Amin*, 932 F.3d at 1303 (finding no constitutional error arising from trial court precluding defense counsel from asking a witness questions that required the witness to speculate and that likely would have led the jury astray).

An additional reason Roberts's claim fails is that the First DCA reasonably could have concluded that even if the trial court erred in disallowing defense counsel's question, the error was harmless. In determining whether a state court had a reasonable basis to find that an error was harmless, federal courts apply the *Brecht* standard. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993); *see also Tarleton v. Sec'y, Fla. Dep't of Corr.*, 5 F.4th 1278, 1291 & n.8 (11th Cir. 2021) (reviewing state appellate court's summary denial of claim on direct appeal; applying *Brecht* standard to determine whether the state court reasonably could have determined that the

alleged error was harmless).[5] Under *Brecht*, an error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id*. at 637.

There is no basis to find that Roberts suffered actual prejudice as required under *Brecht*. The trial transcript establishes that defense counsel was able to fully explore his theory that R.M. was motivated to lie about the consensual nature of the public sexual activity out of concern that she could be arrested, lose her student visa, or suffer some other consequence that would jeopardize her placement in the student exchange program. In other words, defense counsel made the very point that Roberts claims he was restricted from making. Any constitutional error, therefore, was harmless.

---

[5] *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, *supra*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*[ *v. California*], 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [(1967)]."); *Raheem v. GDCP Warden*, 995 F.3d 895, 937 (11th Cir. 2021).

"Because it is not clear that the [state court] erred at all, much less erred so transparently that no fairminded jurist could agree with that court's decision," *Bobby v. Dixon*, 565 U.S. 23, 24 (2011), Roberts is not entitled to habeas relief on Ground One.

**Ground Two**          **"The Lower Court Erred in Permitting a Lay Witness to Give an Improper Opinion and to Improperly Bolster Another Witness." Doc. 1 at 3.**

Roberts's next claim involves the testimony of a law enforcement witness, Sergeant Moore. Roberts alleges that, over defense counsel's objection, "the trial court allowed a female police officer to bolster the alleged female victim's credibility." Doc. 1 at 4. Roberts claims that allowing Moore's testimony "deprived [him] of a fair trial," in violation of his "due process rights under the 4th, 5th, 6th, 8th and 14th Amendments." *Id*. at 4. Roberts asserts that he exhausted this claim by presenting it in his direct appeal. *Id*. at 3. Roberts's initial brief on direct appeal summarized the issue as follows:

> The lower court erred in permitting a law enforcement officer to bolstering [sic] the accuser's testimony by telling the jury that trauma victims have a hard time remembering details. Such is improper opinion testimony and simply prejudicial bolstering. As the credibility of the accuser was a pivotal issue in this case, it was error to permit a law enforcement officer to invade the province of the jury by offering an excuse as to why the accuser could not recall certain details, and to essentially opine as to the accuser's good credibility and the [sic] Mr. Roberts' guilt.

Ex. 6 at 17-18; *see also id.* at 22-26 (Arg.).

The State maintains that to the extent Roberts's habeas claim can be construed as raising a *federal constitutional* claim—as opposed to a state-law issue—the claim is procedurally defaulted because Roberts's direct appeal brief presented the alleged evidentiary error as a purely state-law issue. In other words, Roberts did not apprise the First DCA that the admission of the evidence not only violated state law, but also deprived him of a federal constitutional right. Doc. 16 at 50. The State alternatively argues that even assuming to Roberts's benefit that his federal claim was properly exhausted, he is not entitled to habeas relief because he fails to satisfy § 2254(d)'s demanding standard. Doc. 16 at 51-53.

Roberts responds that because he is proceeding *pro se*, the District Court should liberally construe both his federal habeas petition *and his state-court direct appeal brief* as raising a federal constitutional claim. Doc. 25 at 3-4.

### A.    *Roberts Procedurally Defaulted His Claim that the Admission of Moore's Testimony Violated His Federal Constitutional Rights*

Liberally construing Roberts's *pro se* § 2254 petition as raising a federal constitutional challenge to the admission of Moore's testimony, federal habeas review is not available because that federal claim is procedurally defaulted.[6]

---

[6] To the extent Roberts challenges the evidentiary ruling on state-law grounds, that claim is not cognizable on federal habeas review. Federal habeas relief is available

Roberts's direct-appeal brief did not raise a federal constitutional claim—or cite to any federal case—when arguing that the trial court improperly admitted Moore's testimony. Ex. 6 at 17-18, 22-26. Roberts cited exclusively to state statutes and state caselaw, and all of his substantive arguments addressed Florida law. Specifically, Roberts's narrow argument was that Moore was allowed to improperly bolster R.M.'s testimony through improper opinion testimony, in violation of Fla. Stat. § 90.701, and *Bartlett v. State*, 993 So. 2d 157 (Fla. 1st DCA 2008). *See* Ex. 6 at 22-26. Roberts's final conclusory statement—that "Mr. Roberts was deprived of a fair trial," Ex. 6 at 26—did not bring to the First DCA's attention a federal due process claim.[7] *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam) (reversing grant of habeas petition where the petitioner "did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment"); *Landers v. Warden, Att'y. Gen. of Ala.*, 776 F.3d 1288,

---

to correct only constitutional injury. 28 U.S.C. § 2254(a); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("The habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." (internal quotation marks and citations omitted)).

[7] Predictably, the State's answer brief in Roberts's direct appeal similarly relied exclusively on state statutes and state caselaw, and made no reference to a federal due process standard. *See* Ex. 7 at 10-15.

1296-97 (11th Cir. 2015) (habeas petitioner did not fairly present a Fourteenth-Amendment due-process claim in state court by merely asserting that he did not receive a "fair" proceeding; petitioner provided "no citations to the Fourteenth Amendment and [made] no mention of 'due process'" in his state-court briefs). Roberts's federal constitutional claim, therefore, is procedurally defaulted.[8]

## B.   *Roberts Has Not Overcome His Procedural Default*

Roberts makes none of the required showings to excuse his procedural default. It would be unconvincing for him to argue that the cause of his default was appellate counsel's ineffective assistance in failing to apprise the state court of the federal constitutional nature of his claim, because Roberts did not raise that ineffective-assistance-of-appellate-counsel claim in state court. *See* Ex. 22 (Roberts's state habeas petition alleging ineffective assistance of appellate counsel). "The comity and federalism principles underlying the doctrine of exhaustion of state remedies require an ineffective-assistance claim to be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Edwards v. Carpenter*, 529 U.S. 446, 447 (2000). Roberts's procedural default bars federal habeas review of Ground Two.

---

[8] The rule requiring liberal construction of *pro-se*-pleadings, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), does not apply to Roberts's *counseled* direct-appeal brief.

**Ground Three**      **"The Lower Court Erred in Permitting the Prosecutor to Improperly Insinuate in Closing Argument that There Was More Evidence the Jury Was Not Allowed to Hear, Thus Highlighting Improper Opinion Testimony." Doc. 1 at 3.**

This claim involves the following comment by the prosecutor in his summation to the jury:

> You also heard important testimony from Sergeant Moore, an experienced detective in sex crimes. And while she wasn't allowed to tell you much of what [R.M.] said, for evidentiary reasons, she was allowed to tell you her [R.M.'s] demeanor. And her demeanor was just that of a sexual assault victim. She was traumatized. She made that call to her mother back home in the Netherlands and couldn't keep from crying.

Ex. 4 at 445.

Roberts claims that the trial court erred by not sustaining defense counsel's objection to the comment, and that the comment violated his "due process rights under the 4th, 5th, 6th, 8th and 14th Amendments." Doc. 1 at 4-5. Roberts asserts that he exhausted this claim by presenting it in his direct appeal. *Id*. at 3. Roberts's initial brief on direct appeal summarized the issue as follows:

> The lower court erred in permitting the prosecutor to argue in closing that the arresting officer was not permitted to say everything that the accuser told her due to "evidentiary reasons." This highly improper comment was allowed to stand over defense objection and gave the prosecutor a way to argue to the jury that there was more to the story that they had not heard – that there were things said to the arresting officer that either led to the arrest or that the defense did not want the jury to hear. That caused the jury to speculate about what they had not heard, added improper degree of credibility to the prosecutor's

improper personal opinion of guilt, and was highly prejudicial to Mr. Roberts.

Ex. 6 at 18; *see also id.* at 26-29 (Arg.).

The State maintains that to the extent Roberts's habeas claim can be construed as raising a *federal constitutional* claim—as opposed to a state-law issue—the claim is procedurally defaulted. The State acknowledges that Roberts's substantive argument on direct appeal relied on *Martinez v. State*, 761 So. 2d 1074, 1079-80 (Fla. 2000), which in turn discussed *United States v. Young*, 470 U.S. 1, 18-19 (1985), and *Berger v. United States*, 295 U.S. 78, 88-89 (1935). *See* Ex. 6 at 27-28. The State argues, though, that this was merely a passing reference and that Roberts's overarching argument was grounded in state law. Doc. 16 at 54.

As with Ground One above, the District Court need not decide the exhaustion issue, because even assuming to Roberts's benefit—without deciding—that his direct appeal brief fairly presented a Fourteenth-Amendment due-process claim, Roberts is not entitled to habeas relief.

A.  ***The State Court's Decision is Subject to § 2254(d)'s Deferential Standard of Review***

The First DCA affirmed Roberts's conviction without explanation. Ex. 8. The First DCA's summary affirmance is an "adjudication on the merits" of Roberts's

claim and, therefore, is subject to § 2254(d)'s deferential standard of review. *See Richter*, 562 U.S. at 100.

**B.**    ***Roberts Is Not Entitled to Habeas Relief***

For context, the prosecutor's summation to the jury addressed the defense theory that R.M. fabricated the story that the sex acts in the driveway of the abandoned building were nonconsensual. The prosecutor discussed Officer Maresca's testimony that: (1) R.M. ran to him when he pulled up; (2) the first words out of R.M.'s mouth were, "Help me, he's raping me;" (3) tears were streaming down R.M.'s face; (4) Maresca did not search for Roberts on foot because R.M. was too fearful—she grabbed Maresca's arm and begged him not to leave her alone; and (5) after driving around and being unable to locate Roberts or his house, R.M. agreed without hesitation to go to the hospital for a sexual assault examination. Ex. 4 at 443-44.

The prosecutor then summarized Sergeant Moore's testimony, which is the comment at issue here:

> You also heard important testimony from Sergeant Moore, an experienced detective in sex crimes. And while she wasn't allowed to tell you much of what [R.M.] said, for evidentiary reasons, she was allowed to tell you her [R.M.'s] demeanor. And her demeanor was just that of a sexual assault victim. She was traumatized. She made that call to her mother back home in the Netherlands and couldn't keep from crying.

Page 34 of 78

R.M.'s story makes sense, ladies and gentlemen, because it's true. It rings true. And I'm not asking you to believe her story in a vacuum.

MR. MARTIN [Defense Counsel]:    Objection,    May    we approach?

THE COURT:    You can approach, yes.

(Bench conference.)

MR. MARTIN:  Your Honor, we would object, talking about what the detective could say as far as evidentiary purposes and bolstering her credibility of the witness. The witness wanted to tell you  more but couldn't because we wouldn't let her. That's improper.

THE COURT:    No. I think it's a fair comment on the evidence. The argument is, is it's the truth because these are the factors that would lead a jury to believe that they're true. I think it's within his realm as an argument. So the motion's denied. Objection's overruled.

Id. at 445-46.

This was the portion of Moore's testimony that the prosecutor summarized:

Q [Prosecutor]    Tell the jury the first thing you noted in observing R.M.

A [Sergeant Moore]    She appeared to be tired, slightly confused, but she was very cooperative, was willing to answer my questions and talk to me.

Q    Was she talking to anybody when you first contacted her or at some point when you were with her?

Page 35 of 78

A    When I contacted her one of the things that I do when I speak to victims is ask them if there's anybody that I could contact for them, and she wanted to –

MR. MARTIN:    Your Honor, objection. Hearsay and relevance as well.

THE COURT:    Overruled. Go ahead.

THE WITNESS:    -- to speak to her parents. And I was having difficulty locating them because they were traveling. I was finally able to get a hold of her mother, and I was able to connect her with her mother on the phone. And when she began to speak with her mother, she lost all composure. It was one of the – I don't even know really how to describe it. She became hysterical, had just these guttural noises just coming out of her while she's trying to talk to her mom about what happened to her, and she was just inconsolable.

BY MR. OWEN:

Q    Now, you can't tell me what she said, but I want to ask you a little bit more about our dealings with Ms. M. in the hospital.

Did you obtain information from her?

A    I did.

Ex. 3 at 201-02.

No decision of the United States Supreme Court suggests that the prosecutor's comment in this case was unconstitutional. Roberts's argument to the First DCA relied on *Young* and *Berger*, but the state court's decision was not contrary to, or an unreasonable application of, the Supreme Court's holding in either of those cases.

Page 36 of 78

In *Young*, both defense counsel and the prosecutor repeatedly expressed personal beliefs or opinions on the defendant's guilt. *Young*, 470 U.S. at 4-9. In *Berger*, the prosecutor repeatedly engaged in egregious misconduct throughout the entire trial. As the Court described, the prosecutor "was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner." *Berger*, 295 U.S. at 84.

The prosecutor's single comment here is distinguishable from the conduct at issue in *Young* and *Berger*. The prosecutor did not express a personal opinion concerning Roberts's guilt. The prosecutor merely advocated for a conclusion that reasonably could be reached from the evidence. *See Miller v. State*, 926 So. 2d 1243, 1254-55 (Fla. 2006) ("[A]n attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence.").

Nor did the prosecutor's comment insinuate that there was additional evidence of guilt that Sergeant Moore was prevented from disclosing because of actions the defense had taken. All the prosecutor did was focus the jury's attention on R.M.'s demeanor when Moore was with her, and to suggest that it spoke volumes about whether R.M. had been through a traumatic event (as R.M. testified) or was fabricating a story (as Roberts testified).

But even if the prosecutor's single comment was improper, a fairminded jurist could conclude—within the contours of *Young* and *Berger*—that the isolated, innocuous comment did not deprive Roberts of his constitutional right to a fair trial. The Court in *Young*, which was a direct appeal, held that the prosecutor's comments, although improper, did *not* undermine the fundamental fairness of the trial. *Young*, 470 U.S. at 16. And the Court in *Berger*, which also was a direct appeal, emphasized the unique circumstances that caused the Court to decide that the error was not harmless. In explaining its conclusion, the Court emphasized:

> [W]e have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential.

*Berger*, 295 U.S. at 89 (citations omitted). Unlike the "pronounced and persistent" prosecutorial misconduct in *Berger*, the prosecutor's comment here was slight and confined to a single instance.

Page 38 of 78

In short, because the Supreme Court has not addressed a claim precisely like Roberts's, nor has it ruled on a "materially indistinguishable" set of facts, the First DCA's decision was not "contrary to" Supreme Court precedent. *See Williams*, 529 U.S. at 405-06. And the First DCA's decision was not an unreasonable application of Supreme Court precedent, because the Supreme Court never has held that a prosecutor's single remark of the kind at issue here was so unfair as to violate a defendant's constitutional rights. *See Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." (internal quotation marks omitted)); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonably applied clearly established federal law." (internal quotation marks omitted)); *Landrigan*, 550 U.S. at 478 (state court did not unreasonably apply federal law because "we have never addressed a situation like this."); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here," the denial of relief by the California Court of Appeal "was not contrary to or an unreasonable application of clearly established federal law.").

Page 39 of 78

For all of the reasons discussed above, Roberts is not entitled to habeas relief on Ground Three.

**Ground Four**    **"Lower Court Erred in Not Directing the Verdict to Judgment of Acquittal When the State Failed to Prove One or More of the Essential Elements of the Charged Offense." Doc. 1 at 6.**

Roberts claims, without further explanation, that "[t]he evidence was insufficient as a matter of law to establish one or more of the essential elements of the charged offense" and, therefore, the trial court's failure to direct a verdict of acquittal deprived Roberts of his "due process rights under the 4th, 5th, 6th, 8th and 14th Amendments." Doc. 1 at 6. Roberts asserts that he exhausted this claim by raising it in his first Rule 3.850 motion. *Id*. at 6-7.

The State maintains that this claim is procedurally defaulted for two reasons. First, when Roberts presented the insufficient-evidence issue in his first Rule 3.850 motion, he argued the claim as a purely state-law issue and did not fairly apprise the state court that he was raising a Fourteenth-Amendment due-process claim. Second, the state court rejected Roberts's claim on the independent and adequate state-law ground that the claim was procedurally barred because it could and should have been raised on direct appeal. Doc. 16 at 56-59. The State alternatively argues that Roberts's claim lacks merit. *Id*. at 59-60.

### A. *The State Court's Decision*

Roberts present this claim to the state courts in his first Rule 3.850 motion.

Ex. 9. The state circuit court denied relief as follows:

> 2.    In the instant motion, Defendant alleges that his conviction and sentence are illegal because the State failed to prove all of the elements of the charged offense of Sexual Battery by Threat of Force or Violence. *See* § 794.011(4)(b), Fla. Stat. (2014).
>
> 3.    The claim raised is procedurally barred. A defendant cannot challenge the sufficiency of the evidence underlying his conviction through a rule 3.850 motion, especially where there has been a direct appeal. *Betts v. State*, 792 So. 2d 589, 590 (Fla. 1st DCA 2001); *see also Johnson v. State*, 593 So. 2d 206, 208 (Fla. 1992) ("[i]ssues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack"). Motions filed under rule 3.850 "cannot be utilized for a second appeal." *Jones v. State*, 446 So. 2d 1059, 1061-62 (Fla. 1984).

Ex. 10. The First DCA summarily affirmed without explanation. Ex. 13.

### B. *Roberts's Claim is Procedurally Defaulted*

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Thus where, as here, "the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Id*. at 803; *see also Richter*, 562 U.S. at 99-100 (citing *Ylst* as an example of where the presumption of a merits adjudication

is overcome). In other words, this court presumes that the First DCA invoked the same state procedural bar as the lower state court.

The state courts' ruling that Roberts's claim was procedurally barred under Florida law rested on an independent and adequate state ground. *See* Ex. 10 (collecting cases); *see also* Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."); *LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1260 & n.25 (11th Cir. 2005) (habeas petitioner's claim was procedurally defaulted because the state courts rejected the claim on the independent and adequate state-law ground that it could have been raised on direct appeal but was not). Roberts's claim, therefore, is procedurally defaulted.

## C.  *Roberts Has Not Overcome His Procedural Default*

Roberts makes none of the required showings to excuse his procedural default. He argues that his default should be excused because he was proceeding *pro se* in his initial Rule 3.850 proceeding. Doc. 25 at 8-9. Liberally construing this argument as attempting to invoke the equitable rule in *Martinez v. Ryan*, 566 U.S. 1 (2012), this argument fails.

In *Martinez*, the Supreme Court "announced an equitable rule whereby a federal petitioner may establish cause, in narrow circumstances, to excuse the procedural default *of an ineffective-assistance-of-trial-counsel claim*." *Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1248-49 (11th Cir. 2014) (emphasis added); *see Martinez*, 566 U.S. at 9, 13-14. The rule in *Martinez* applies only to excusing the procedural default of an ineffective assistance of trial counsel claim. 566 U.S. at 17. *Martinez* does not apply to the type of trial-court-error claim Roberts attempts to raise here. Roberts, therefore, cannot benefit from *Martinez*.

Additionally, it would be unconvincing for Roberts to argue that the cause of his default was appellate counsel's ineffective assistance in failing to challenge the sufficiency of the evidence on direct appeal. Roberts did not raise that ineffective-assistance-of-appellate-counsel claim in state court. *See* Ex. 22 (Roberts's state habeas petition alleging ineffective assistance of appellate counsel); *see also Edwards*, 529 U.S. at 447.

Roberts's procedural default bars federal habeas review of Ground Four.

**Ground Five**     **<u>"Trial Counsel Was Ineffective for Failing to Investigate and Evaluate Defendant's Competency to Proceed to Trial, Had the Defendant Had a Psychological Evaluation There Is a Reasonable Probability the Defendant Would Have Been Found Incompetent." Doc. 1 at 8.</u>**

Roberts alleges that trial counsel was ineffective for failing to have him evaluated for competency to stand trial. Doc. 1 at 8. Roberts explains:

> The Defendant submits that he was suffering memory issues prior to and during trial. Alachua County Officials assaulted the defendant prior to trial, and injuries from this assault caused the Defendant to suffer memory issues and cognitive impairment during trial.

*Id*. at 9. Roberts alleges that trial counsel knew of his injuries, because he obtained photographs of them prior to trial. *Id*. at 9. Roberts asserts that he exhausted this claim by presenting it in his second Rule 3.850 motion. *Id*. at 8-9.

The State responds that Roberts is not entitled to habeas relief because the state court rejected this claim on the merits, and Roberts fails to satisfy § 2254(d)'s demanding standard. Doc. 16 at 60-62.

### A.    *The State Court's Decision*

Roberts presented this claim to the state courts in his second Rule 3.850 motion. Ex. 17. The state circuit court determined that the record conclusively refuted Roberts's factual allegations underpinning the ineffective-assistance claim, and denied relief because the motion was "frivolous, malicious, and an abuse of process." Ex. 18 (Order at 3-4 in ECF). The First DCA affirmed, explaining:

> Appellant challenges the trial court's denial of his rule 3.850 motion for postconviction relief, alleging a single claim of ineffective assistance of counsel. On April 21, 2016, a jury convicted Appellant of sexual battery by threat of force or violence. On July 7, 2016, at sentencing, the trial court sentenced Appellant to thirty years in prison.

Page 44 of 78

On appeal, this Court affirmed Appellant's judgment and sentence without opinion, and the mandate was issued on December 20, 2017. *See Roberts v. State*, 237 So. 3d 272 (Fla. 1st DCA 2017). This Court has also affirmed without opinion other collateral postconviction filings that Appellant has appealed. *See Roberts v. State*, 268 So. 3d 105 (Fla. 1st DCA 2019).

On September 23, 2019, Appellant filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. On October 7, 2019, the trial court denied Appellant's motion.

In his motion for postconviction relief, Appellant argued that he was denied effective assistance of counsel when his trial counsel failed to determine whether he was competent to stand trial. Appellant alleged that he was assaulted by Alachua County Jail correction officers prior to trial and that he sustained injuries to his neck and head after his head was pushed into a wall. Trial counsel was notified of the incident, and Appellant argued that he advised counsel on multiple occasions that he had suffered severe memory loss, amnesia, a concussion, and debilitating headaches from the injuries. Appellant "affirmatively submits" that he was not competent to stand trial as a result of these injuries and that trial counsel should have known this. Appellant argued he was prejudiced because the amnesia and impaired cognitive capabilities prevented him from assisting in his trial as he could not remember pertinent facts and details of events around the incident, the legal matters at issue, and could not provide meaningful and relevant testimony in his own defense. Further, his condition allowed the State to insinuate he was lying under oath and discredit his testimony. Had counsel moved to investigate his competency, the outcome of the proceedings would have been different.

We find Appellant's motion is successive. Appellant previously appealed the denial of a rule 3.850 motion before this Court, which we affirmed. *See Roberts v. State*, 268 So. 3d 105 (Fla. 1st DCA 2019). Florida Rule of Criminal Procedure 3.850(h) identifies a second or successive motion as an "extraordinary pleading" and states that such a motion may be dismissed if it:

fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the defendant . . . to assert those grounds in a prior motion constituted an abuse of the procedure or there was no good cause for the failure of the defendant . . . to have asserted those grounds in a prior motion.

Fla. R. Crim. P. 3.850(h)(2).

On appeal, Appellant contends that his motion is not truly successive because "[the] memory of the events in question has now begun to come back" and that he could not have previously raised this motion in good faith because of his cognitive impairments. He further argues that he "never knowingly filed an original 3.850 motion," but rather that he previously filed two petitions for habeas corpus that were "improperly converted" to rule 3.850 motions by the lower court. For reasons outlined below, we are not persuaded by Appellant's argument and do not believe that he has demonstrated good cause to be entitled to such an extraordinary pleading.

Even if not successive, Appellant's claim of ineffective assistance of counsel is meritless. To prove ineffective assistance of counsel, a defendant must allege (1) the specific acts or omissions of counsel which fell below a standard of reasonableness under prevailing professional norms and (2) the defendant's case was prejudiced by these acts or omissions such that the outcome of the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 690–92, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The deficient performance prong requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687, 104 S. Ct. 2052. The prejudice prong requires that the defendant demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 694, 104 S. Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The defendant must demonstrate a likelihood of a different result which is

substantial and not just conceivable. *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

"To satisfy the deficiency prong based on counsel's handling of a competency issue, the postconviction movant must allege specific facts showing that a reasonably competent attorney would have questioned competence to proceed." *Thompson v. State*, 88 So. 3d 312, 319 (Fla. 4th DCA 2012). "The question is 'whether the defendant has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and whether the defendant has a rational, as well as factual, understanding of the pending proceedings.'" *Id*. (citing Fla. R. Crim. P. 3.211(a)(1)). "In order to establish prejudice in a properly raised ineffective assistance of counsel claim, the postconviction movant must . . . set forth clear and convincing circumstances that create a real, substantial and legitimate doubt as to the movant's competency." *Id*. "Conclusory allegations of incompetency are not enough to warrant an evidentiary hearing." *Id*. (citing *Atwater v. State*, 788 So. 2d 223, 229 (Fla. 2001)). Further, "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Id*. at 319 (citing *Card v. Singletary*, 981 F. 2d 481, 487–88 (11th Cir. 1992)).

This Court's review of the record on appeal shows that Appellant testified extensively in his own defense at trial. Appellant's testimony was thorough and highly detailed. He advised the jury of what he was doing when he met the victim, and he remembered that he had gotten off work early that night. He remembered what he had been doing earlier that evening and what his plans had been for that night. He told the jury the precise times that he met with a friend and remembered meeting other people that he knew. Appellant gave detailed descriptions of the places that he had been, what he did at those locations, and approximately how long he stayed at those locations. He gave a thorough explanation of how he met the victim and what activities they engaged in. Appellant was even able to describe the victim's behavior after the incident. He continued to give detailed testimony and explanations for his behavior after the incident and during a subsequent meeting with the police. Additionally, at his

sentencing hearing, Appellant gave a detailed and coherent *pro se* argument on a motion of reduction to lesser charge, which further demonstrated that he understood the proceedings and the nature of the charges against him.

Therefore, the trial proceedings thoroughly refute Appellant's allegations that he was suffering from amnesia, an inability to recall events on the night of the incident, or that his cognitive capabilities were otherwise impaired by his injuries. Because of this, trial counsel could not be ineffective for failing to file a suggestion of incompetency because she would not have had a good faith basis to file such a pleading. *See Williams v. State*, 987 So. 2d 1, 10 (Fla. 2008) (concluding that counsel was not ineffective for failing to file a motion where there was no legally sufficient basis for doing so). In view of the above, we AFFIRM the trial court's ruling as to all of Appellant's claims.

*Roberts*, 306 So. 3d at 1189–91 (copy at Ex. 21 at 1-5 in ECF). The Florida Supreme Court declined to accept jurisdiction. *Roberts*, 2021 WL 1081410 (copy at Ex. 21 at 11 in ECF).

**B.    *The First DCA's Determination that Roberts's Claim Was Successive Renders His Claim Procedurally Defaulted***

The First DCA held that Roberts's claim was procedurally barred under Florida law because it was successive. This was an independent and adequate state-law basis to reject Roberts's claim. *See* Fla. R. Crim. P. 3.850(h)(2). This renders Roberts's ineffective-assistance claim procedurally defaulted on federal habeas review. *See Jennings v. McDonough*, 490 F.3d 1230, 1247-48 (11th Cir. 2007) (state court's conclusion that petitioner's claims were procedurally barred by Florida's rule

against successive postconviction motions was a state-law ground independent of the federal question and adequate to support the state court's judgment, thereby rendering the claims procedurally defaulted on federal habeas review).

Although the First DCA alternatively addressed the merits of Roberts's claim, that does not nullify the procedural default. When a state court rests its denial of a claim on state procedural grounds, but in the alternative reviews the merits of the claim, federal courts on habeas review must apply the state procedural bar and decline to reach the merits. *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995); *Alderman v. Zant*, 22 F.3d 1541 (11th Cir. 1994). The Supreme Court has explained:

> A state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.

*Harris*, 489 U.S. at 264 n.10 (citation omitted).

Roberts has made none of the requisite showings to excuse his procedural default. Roberts's procedural default bars federal habeas review of Ground Five.

### C.    *Roberts Is Not Entitled To Habeas Relief on the Merits*

Even if Roberts overcame his procedural default, Roberts is not entitled to habeas relief because he fails to satisfy § 2254(d)'s demanding standard.

### i. Clearly Established Federal Law Governing Claims of Ineffective Assistance of Counsel

The Supreme Court follows a two-pronged test for evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must show that (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. *See id.* at 687.

The inquiry under *Strickland*'s performance prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689.

Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The burden to overcome that presumption and to show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted)); *see also Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000)

("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."). As a consequence of this burden, "when the evidence is unclear . . ., [courts] presume counsel performed reasonably and exercised reasonable professional judgment." *Blankenship v. Hall*, 542 F.3d 1253, 1274 (11th Cir. 2008) (citations omitted).

*Strickland*'s second prong requires a defendant to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable

under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). The Supreme Court explained in *Richter*:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

562 U.S. at 105 (citations omitted).

### ii.     Roberts Fails to Satisfy § 2254(d)'s Demanding Standard

The First DCA's alternative ruling rejected Robert's ineffective-assistance claim on the merits. The First DCA's decision was not "contrary to" clearly established Federal law, because the state court identified and applied the two-part *Strickland* standard. *See Williams*, 529 U.S. at 405-06 (interpreting § 2254(d)(1)). To obtain habeas relief, therefore, Roberts must show that the state court's application of the *Strickland* standard was unreasonable, or that its decision was based on an unreasonable determination of the facts in light of the record before the state court.

The First DCA's factual findings are amply supported by the state-court record. Roberts has not shown that any factual determination lacks record support,

nor has Roberts rebutted any factual determination with clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(d)(2); 28 U.S.C. § 2254(e); *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). Roberts's conclusory assertion—that "[t]he record only demonstrates the Petitioner's memory after trial"—is conclusively refuted by the detailed portions of the record the First DCA discussed.

Based on the First DCA's factual findings, a fairminded jurist could agree with the state court's conclusions that (1) counsel would not have had a good-faith basis to seek a competency evaluation and, therefore, (2) counsel could not be ineffective for failing to file a suggestion of incompetency or otherwise raise the competency issue. *See Holladay v. Haley*, 209 F.3d 1243, 1250 (11th Cir. 2000) ("[C]ounsel is not required to seek an independent evaluation when the defendant does not display strong evidence of mental problems."); *see also Freeman v. Att'y Gen., Fla.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim. . . ."); *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) ("Counsel was not ineffective for failing to raise these issues because they clearly lack merit."); *Bolender v. Singletary*, 16 F.3d 1547, 1473 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

For all of the reasons discussed above, Roberts is not entitled to habeas relief on Ground Five.

**Ground Six** **"Ineffective Assistance of Appel[l]ate Counsel for Failing to Raise Trial Counsel's Ineffectiveness on Direct Appeal for Failing to Impeach Alleged Victim and for Failing to Correct False or Misleading Testimony; Appellate Counsel Was Ineffective for Failing to Raise Giglio Claim from False Testimony." Doc. 1 at 10.**

Roberts claims that his appellate counsel was ineffective for failing to raise three issues on direct appeal: (1) trial counsel was ineffective for failing to impeach R.M.'s testimony "with medical evidence, which is obvious from the face of the record;" (2) trial counsel was ineffective for "allow[ing] the alleged victim's false testimony at trial to go uncorrected even though the prosecutor knew the testimony was false;" and (3) the State violated *Giglio*.[9] Doc. 1 at 11-12.

---

[9] *See Giglio v. United States*, 405 U.S. 150 (1972). "In *Brady v. Maryland*, the Supreme Court held that 'the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment.'" *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1319 (11th Cir. 2013) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "*Giglio* error, a species of *Brady* error, occurs when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'" *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (quoting *Ventura v. Attorney Gen., Fla.*, 419 F.3d 1269, 1276-77 (11th Cir. 2005)); *see also Hammond v. Hall*, 586 F.3d 1289, 1306-1307 (11th Cir. 2009) ("A *Giglio* claim involves an aggravated type of *Brady* violation in which the suppression of evidence enabled the prosecutor to put before the jury what he knew was false or misleading testimony, . . . or allowed the prosecutor himself to make a false statement to the jury." (citations omitted)).

Page 54 of 78

The parties agree that Roberts exhausted this claim by raising it in his state habeas petition alleging ineffective assistance of appellate counsel. Doc. 1 at 10; Doc. 16 at 62. The State asserts that Roberts is not entitled to habeas relief because he fails to satisfy § 2254(d)(1)'s demanding standard. Doc. 16 at 62-65.

## A.    *The State Court's Decision*

Roberts raised this claim in his state habeas petition as "Ground Two." Ex. 22. The First DCA denied relief as follows:

> The petition alleging ineffective assistance of appellate counsel is denied on the merits.

> Court records indicate that this is Petitioner's third pro-se postconviction filing in this Court challenging his judgment and sentence in Alachua County Circuit Court Case No. 2015-CF-001165: Case Nos. 1D18-1567 and 1D19-4034 in addition to this case. Petitioner has failed to raise any meritorious issue in these three cases. A fourth postconviction case, Case No. 1D19-4086, remains pending. The Court warns Petitioner that any future pro-se filings arising out of this judgment and sentence that the Court determines to be frivolous may result in the imposition of sanctions, including a prohibition against any further pro-se filings in this Court and a referral to the appropriate institution for disciplinary procedures. *See* § 944.279, Fla. Stat. (2019) (providing that if a court finds that a prisoner has brought a frivolous or malicious suit, action, claim, proceeding, or appeal, the prisoner is subject to disciplinary procedures under Department of Corrections rules).

---

To establish a *Giglio* violation, a petitioner must demonstrate that the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony, and that the falsehood was material. *Tompkins v. Moore*, 193 F.3d 1327, 1339 (11th Cir. 1999).

*Roberts*, 303 So. 3d 990 (Fla. 1st DCA 2020) (copy at Ex. 25 at 1-2 in ECF). The Florida Supreme Court declined to accept jurisdiction. *Roberts*, 2020 WL 7419103 (copy at Ex. 25 at 7 in ECF).

### B.    *Clearly Established Federal Law*

The clearly established federal law governing claims of ineffective assistance of appellate counsel is the *Strickland* standard set forth above. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding that *Strickland* is the proper standard for evaluating a claim that appellate counsel was ineffective).

### C.    *Roberts Is Not Entitled to Habeas Relief*

The First DCA's decision is an "adjudication on the merits" of Roberts's claim and, therefore, is reviewed under § 2254(d)'s deferential standard. Where, as here, "a state court's decision is unaccompanied by an explanation," a petitioner's burden under § 2254(d) is to "show[ ] there was no reasonable basis for the state court to deny relief." *Richter,* 562 U.S. at 98. "[A] habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Id.* at 102.

As to the first proposed appellate issue, one theory that could have supported the First DCA's decision is that Roberts's proposed IATC claim—trial counsel's failure to impeach R.M. with "medical evidence"—had little chance of success and, therefore, appellate counsel was not ineffective for failing to argue it. Roberts provided the First DCA with this factual basis for his proposed claim:

> Contrary to medical evidence, R.M. testified that she did not engage in anything beyond kissing and touching with the defendant at his residence. T. 63. Dr. Kendall Moore who performed the sexual assault examination on R.M., testified that there was an indication that both penile and digital penetration of the vagina were involved. T. 253-2254. FDLE Analyst Amanda Stratton testified that the defendant's DNA was found on R.M.'s vaginal labia swab. T. 309, 320, 322, 323.

Ex. 22 at 10.

The medical evidence did not contradict R.M.'s testimony. R.M. testified that (1) she and Roberts only kissed and "made out" in Roberts's bedroom, (2) Roberts's penetration of her vagina occurred in the parking lot/recessed driveway of the abandoned building, and (3) the vaginal penetration was not consensual. The medical evidence established that *vaginal penetration occurred*. It did not establish *where* it occurred or *whether it was consensual*.

Because Roberts's alleged impeachment evidence did not contradict R.M.'s testimony, the state court reasonably determined that appellate counsel was not ineffective for failing to argue on direct appeal that trial counsel was ineffective for

failing to attempt to impeach R.M. with it. *Tuomi v. Sec'y, Fla. Dep't of Corr.*, 980 F.3d 787, 797-98 (11th Cir. 2020) (appellate counsel was not ineffective for failing to raise a claim that lacked merit); *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) ("[A]ppellate counsel was not ineffective for failing to raise a nonmeritorious issue."); *see also Johnson v. Sec'y, Fla. Dep't of Corr.*, 680 F. App'x 869, 872 (11th Cir. 2017) (trial counsel was not ineffective for failing to present evidence that the petitioner claimed would have impeached the victim's credibility when, in reality, the evidence would not have refuted any of the victim's testimony).

Roberts's two remaining ineffective-assistance-of-appellate-counsel claims rely on the same theory as his first—that Dr. Moore's report and the DNA evidence contradicted R.M.'s testimony and made it false. Specifically, Roberts claims that appellate counsel was ineffective for failing to raise (1) an ineffective-assistance-of-trial-counsel claim for "allow[ing]" the "false testimony" to "go uncorrected" and (2) a *Giglio* claim. However, as discussed above, Roberts's underlying theory is frivolous because the medical evidence does not contradict R.M.'s testimony. It follows, then, that the claims would not have had a reasonable probability of success on appeal.[10]

---

[10] Moreover, fatal to any *Giglio* claim is the fact that the medical evidence on which Roberts relies was not suppressed. It was presented and fully developed at trial.

The First DCA's rejection of Roberts's claim was not contrary to and did not involve an unreasonable application of the *Strickland* standard. Roberts is not entitled to habeas relief on Ground Six.

**Ground Seven**     **"Ineffective Assistance of Appellate Counsel for Failing to Investigate Trial Audio and Trial Video; Failed to Seek Correction of Trial Transcript; Failed to Raise Improper Playback of Testimony." Doc. 1 at 11.**

Roberts claims that his appellate counsel was ineffective for failing to "investigate trial audio and trial video, which would have revealed multiple errors and omissions in the trial transcript and errors of the trial." Doc. 1 at 12. In support, Roberts alleges that: (1) the transcript "omits" comments the prosecutor made during closing arguments that "could be considered prosecutorial misconduct;" and (2) the transcript contains "errors" regarding R.M.'s testimony such that "[t]he error and or errors in the trial transcript do not accurately record testimony that pertains to the specific acts and specific elements in question." *Id*. at 12.

Roberts also alleges that had appellate counsel investigated the digital recordings of the trial, counsel would have learned that in response to the jury's request for a play-back of a portion of R.M.'s testimony, the court provided the jury with only R.M.'s direct-examination and not her cross-examination. Doc. 1 at 13. Roberts claims in his habeas reply that had the play-back of *cross-examination* been included—not just the audio but also the video—it would "clearly identify the

Page 59 of 78

alleged victim shaking her head 'no' when asked if she was threatened." Doc. 25 at 15.

The parties agree that Roberts exhausted this ineffective-assistance-of-appellate-counsel claim by raising it in his state habeas petition. Doc. 1 at 10-11; Doc. 16 at 66. The State asserts that Roberts is not entitled to habeas relief because he fails to satisfy § 2254(d)(1)'s demanding standard. Doc. 16 at 66-68.

## A.    *The State Court's Decision*

Roberts raised this claim in his state habeas petition as "Ground Three." Ex. 22. The First DCA denied relief as outlined above. *See* Ground Six, *supra*.

## B.    *Roberts Is Not Entitled to Habeas Relief*

Roberts must show that the First DCA's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Roberts fails to make that showing.

### i.    <u>Failure to Investigate/Discover Improper Prosecutorial Comments Omitted from Trial Transcript</u>

Roberts faults appellate counsel for failing to discover—and raise on direct appeal—improper prosecutorial comments during closing argument that were omitted from the trial transcript. Roberts's state habeas petition alleged that the prosecutor falsely stated during closing arguments "that the defendant made specific

violent threats to R.M." Ex. 22 at 11. Roberts alleged that the "fabricated false comments" were "omitted from the trial transcript." *Id*. at 11. Roberts faulted appellate counsel for failing to discover the comments by investigating the digital recordings of the trial. *Id*. at 11. Roberts asserted that counsel's deficiency prejudiced him because "[t]hese fabricated false comments could be prosecutorial misconduct, which can be fundamental error and brought up on direct appeal absent contemporaneous objection." *Id*. at 11.

The First DCA's rejection of this claim was a reasonable application of the *Strickland* standard. Roberts's state habeas petition did not allege—or even hint—that appellate counsel had any reason to suspect that improper prosecutorial comments were made but not reflected in the trial transcript. Roberts did not allege that he told appellate counsel about the improper comments. Roberts would have known about the comments because he was present during closing arguments.

Because Roberts did not allege that he told appellate counsel about the improper comments (or that counsel had any other reason to suspect they existed), the First DCA reasonably could have concluded that appellate counsel was not deficient for failing to investigate. *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based . . . on information supplied by the defendant."); *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) ("An attorney does not render

ineffective assistance by failing to discover and develop evidence . . . that his client does not mention to him."); *Chandler*, 218 F.3d at 1324 ("The reasonableness of a trial counsel's acts, including lack of investigation . . ., depends critically upon what information the client communicated to counsel." (internal quotation marks omitted)); *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1325 (11th Cir. 2002) ("Information supplied by a petitioner is extremely important in determining whether a lawyer's performance is constitutionally adequate."); *Holladay v. Haley*, 209 F.3d 1243, 1251-52 (11th Cir. 2000) ("Counsel have a duty to investigate but this duty is confined to reasonable investigation.").

### ii.   Failure to Discover and Correct Alleged Transcription Error Involving R.M.'s Testimony on Direct-Examination

Roberts also faults appellate counsel for failing to discover—and raise on direct appeal—an alleged error in the transcription of R.M.'s trial testimony, specifically, her response to a question on direct-examination. In his state habeas petition, Roberts alleged:

> R.M. was questioned by the state counsel about a specific violent threat being made to her, she responded, "no. It was something about the light in my eyes," and shook her head left to right while saying "no." Trial transcript has her response as, "Yes. It was something about the light in my eyes." Trial video would show her head shaking left to right signifying "no." Trial audio would hear her saying "no."

Ex. 22 at 11. Roberts claimed that appellate counsel's failure to discover the alleged transcription error "prejudiced the defendant from having a meaningful appellate review." *Id*. at 12.

Roberts's claim of a transcription error involves this portion of the trial transcript:

Q [Prosecutor]    What happens when you try to get up?

A [R.M.]    He forces me back to the ground. He grabs me by my neck.

Q    And pushes you back to your knees?

A    Yes.

Q    What do you do at this point? Well. Let me ask you this?

As he forces you back down, does he say anything to you that you remember?

A    He says I shouldn't walk away. I remember him saying something about, I will never to see light in my eyes again.

Q    Okay. I just want to be clear. When you tried to get away and he forced you back down, you said he told you would never see the light of day again if you tried to get away?

A    Yeah, something with light in my eyes, yes.

Ex. 2 at 73-74.

The First DCA reasonably could have concluded that appellate counsel was not ineffective for failing to discover and raise the alleged transcription error,

Page 63 of 78

because no appellate issue would have arisen from the alleged error. It was a *post-trial* error. The jury never saw the trial transcript. The jury heard the victim's trial testimony and watched her testify. The jury based its verdict on that testimony—including a play-back of the audio—and the other evidence in the case. Appellate counsel cannot be ineffective for failing to raise an issue that would not have gotten his client any relief. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."); *Chandler*, 240 F.3d at 917 (appellate counsel could not be ineffective under *Strickland* for failing to raise a futile issue).[11]

### iii.  <u>Failure to Investigate Contents of Testimony Play-Back</u>

Roberts faults appellate counsel for failing to discover—and raise on direct appeal—a challenge to the trial court's play-back of R.M.'s testimony to the jury. To provide context for this claim, the relevant portion of the trial transcript follows. After the jurors retired for deliberations, they sent a question to the judge:

> THE COURT: All right. I've received the following communication from the jury, and it's a question:
>
> What was R.M.'s testimony about her interaction with the defendant in GRU parking lot?

---

[11] The alleged transcription error in R.M.'s direct testimony would not have affected any of the three trial-court-error issues raised in Roberts's direct appeal. *See* Ex. 6.

Okay. That's the question.

MR. MARTIN [Defense Counsel]:    Your Honor, I think the court has two options. The court can interpret that as a request for a read back, which that's what I think it is, or the court can say, You have to rely on your own memory.

THE COURT:    I understand the two choices.

MR. RODGERS [Prosecutor]:   Yes, your Honor. And I would agree. I think the court gets to interpret that as a read back since the idea of the courts have said – is that these are lay folks that don't know how to speak our language. And so I think they're asking for a specific read back, and I think they're entitled to do so, to ask for that and to receive that.

THE COURT:    I don't have a problem with the read back; the court reporter may. We've got to give her time to find it and –

THE COURT REPORTER:    Well, I wasn't here for that testimony.

THE COURT:    That's right, you weren't.

THE COURT REPORTER:    And I will play back.

THE COURT:    How do you do that? You mean verbally?

THE COURT REPORTER:    From my laptop.

THE COURT:    You can do it with an audio.

THE COURT REPORTER:    With audio.

THE COURT:    Okay. See if we –

THE COURT REPORTER:    I'll have to find it.

Page 65 of 78

THE COURT:        Why don't you go ahead and see if you can find it. It's her interaction – basically, it's her interaction with the defendant in the parking lot. It doesn't say – it's not her conversation; it's her testimony about her interaction.

THE COURT REPORTER:        Right. So it would be direct?

THE COURT:        It could be direct and cross. It could be in different places. So let's give you some time.

THE COURT REPORTER:        Right.

THE COURT:        Okay. Let's do this: I will send the jury back a note that says we are attempting to locate that testimony in the record for purposes of republishing it to you, and that will take some time. Continue your deliberations and we will call you back in when we're ready.

        Is that acceptable to both of you?

MR. OWEN [Prosecutor]:        Acceptable to the State.

MR. MARTIN:        Yes, sir.

(Pause)

MR. MARTIN:        Your Honor, can I – I was wondering if I could see the question?

THE COURT:        Yeah, go ahead. I'll put it in the record.

        All right. This is the response I'm going to give to that question is: We are attempting to locate the testimony you requested in the court record. This will take some time, as the court reporter must review the direct and cross-examination of R.M. When located, you will be brought back into the court, and the testimony will be played or read to you.

Any objection to that?

MR. MARTIN:      No, sir.

THE COURT: Thank you. We'll be in recess.

(Recess)

THE COURT:      The record will reflect the jurors asked a question, and counsel, in the interim, as I understand it, have pretty much agreed on what is to be played back?

MR. OWEN:      That's the State's understanding.

MR. MARTIN:      Yes, sir.

THE COURT:      Okay. Then what we'll do is bring in the jury, and I will let them hear whatever it is you've agreed to.

(The jury enters the courtroom.)

THE COURT:      I was in receipt of your question. And your question was:   What was R.M.'s testimony about her interaction with the defendant in GRU parking lot?

I asked – both counsel have studied the record, and they've agreed on these portions to be played back to you in answer to this question. So I'd ask you to pay attention to that, please.

(The record is played back for the jury.)

THE COURT:      Is that the agreed upon portions that the State intends?

MR. MARTIN:      Yes, sir.

MR. RODGERS:  Yes, your Honor.

Page 67 of 78

THE COURT:        Thank you.

      That's the republication. You may retire and finish your deliberations. Thank you.

(The jury leaves the courtroom at 2:42 p.m.)

THE COURT:        All right. The jury has recommenced, and we will be in recess until they let us know something else. Thank you.

(Recess)

Ex. 4 at 513-16.

      In his state habeas petition, Roberts alleged that had appellate counsel investigated the audio and video recordings of the trial, counsel would have learned that the jury was provided only with a play-back of R.M.'s *direct*-examination and not her *cross*-examination. Roberts maintained that omitting R.M.'s cross-examination deprived him of a fair trial. *See* Ex. 22 at 12.

      The First DCA reasonably could have rejected Roberts's ineffective-assistance-of-appellate-counsel claim because Roberts's state habeas petition did not identify any basis that would have alerted counsel to investigate the play-back for a possible appellate issue. The trial transcript establishes that the trial court and the parties were aware that the play-back should include relevant portions of both direct and cross, and that defense counsel and the prosecutor agreed on what portions should be republished. Nothing in the record put appellate counsel on notice that the

play-back might not have included relevant portions of R.M.'s cross-examination. Roberts's state habeas petition did not allege that Roberts told appellate counsel that R.M.'s cross-examination was not included.[12] *See Strickland*, 466 U.S. at 691; *Williams*, 185 F.3d at 1237; *Chandler*, 218 F.3d at 1324; *Van Poyck*, 290 F.3d at 1325; *Holladay*, 209 F.3d at 1251-52.

For all of the reasons set forth above, the First DCA's rejection of Roberts's ineffective-assistance-of-appellate-counsel claim was neither contrary to, nor an unreasonable application of, clearly established Federal law. Roberts, therefore, is not entitled to habeas relief on Ground Seven.

**Ground Eight**      **"Ineffective Assistance of Appellate Counsel for Failing to Raise Trial Counsel's Ineffectiveness on Direct Appeal for Failing to Subject the Prosecution's Case to a Meaningful Adversarial Challenge; Failed to Raise Trial Counsel's Cumulative Error on Direct Appeal." Doc. 1 at 11.**

Roberts claims that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective for (1) "failing to hold the government to the burden of proof," (2) "failing to have a focused defense strategy," and (3) "sabotaging" Roberts's case during closing argument. Doc. 1 at 13-14.

---

[12] The play-back occurred in open court. Thus, Roberts would have been present and heard it. If Roberts was not present in open court, his current allegation that R.M.'s cross-examination was omitted from the play-back is nothing more than speculation.

The parties agree that Roberts exhausted this ineffective-assistance-of-appellate-counsel claim by raising it in his state habeas petition. Doc. 1 at 10-11; Doc. 16 at 68. The State asserts that Roberts is not entitled to habeas relief because he fails to satisfy § 2254(d)(1)'s demanding standard. Doc. 16 at 68-75.

## A.    *The State Court's Decision*

Roberts raised this claim in his state habeas petition as "Ground Four." Ex. 22. The First DCA denied relief as outlined above. *See* Ground Six, *supra*.

## B.    *Roberts Is Not Entitled to Habeas Relief*

In pleading his ineffective-assistance-of-appellate-counsel claim in state court, Roberts made numerous allegations but backed none of them up with citations to the record. Roberts baldly asserted that defense counsel (Mr. Martin): (1) "had no focused defense strategy," (2) "failed to address the only aspects of the trial that mattered during closing arguments, focused on things that did not matter, and referred to his client as 'the big bad wolf,'" (3) sabotaged the defense by saying that Roberts's version of the incident "sounded like it was from a movie;" (4) "attacked his own client's credibility," and (5) "referred to the defendant as a villain that preys on women." Ex. 22 at 13-14.

The First DCA reasonably could have rejected Roberts's claim out of hand, because the trial transcript conclusively refuted his underlying allegations against

trial counsel. *See* Exs. 2-4. The trial transcript demonstrates that trial counsel had a very focused strategy. The only realistic defense strategy was to raise reasonable doubt on the issues of consent and coercion. On these issues, the case was a classic he-said, she-said dispute. Trial counsel focused on persuading the jury that it should believe Roberts's version over R.M.'s version. Exs. 2-4.

To that end, trial counsel extensively cross-examined every State witness, including R.M. Counsel emphasized, during cross-examination of R.M., that: (1) R.M. admitted that she had been sexually attracted to Roberts, that she willingly went home with him, and that she engaged in consensual kissing and touching at his home; (2) R.M. had been drinking with friends before she met Roberts and was under the influence of alcohol which, counsel suggested, affected the reliability of her recall of events; (3) R.M. could have been motivated to lie about the consensual nature of the sexual conduct in the driveway out of fear she could be removed from the student exchange program. Ex. 2 at 86-108. A fairminded jurist could agree with the First DCA's conclusion that defense counsel's choice of defense strategy and implementation of that strategy was reasonable. *See Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010) ("We have long held that the fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel." (citing *Chandler*, 218 F.3d at 1314)); *Felker v. Thomas*, 52 F.3d 907, 912 (11th Cir. 1995) (whether to

pursue residual doubt or another defense is strategy left to counsel, which a court must not second-guess); *Day v. Sec'y, Fla. Dep't of Corr.*, 859 F. App'x 875, 879 (11th Cir. 2021) ("It is clearly established that strategic choices made after thorough investigation of law and facts relevant to plausible options are 'virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)).

Regarding defense counsel's closing arguments, counsel addressed both the direct evidence against Roberts as well as the volume of circumstantial evidence on the elements of coercion and lack of consent. Ex. 4 at 464-87. Counsel's extensive closing argument was necessary given the substantial amount of evidence he had to explain away to the jury. A fairminded jurist could agree with the First DCA's conclusion that trial counsel's closing argument was reasonable and, therefore, that appellate counsel was not ineffective for failing to challenge it.

Roberts claims that appellate counsel should have challenged, as ineffective, an alleged remark by trial counsel referencing Roberts as the "big bad wolf." Ex. 22 at 14.  That comment, however, must be viewed in context. The entirety of the comment is:

> We want to put this big bad wolf moniker on Mr. Roberts, that he's someone out there that's preying on women. And I'm not sure why that's the case when there's no evidence to that effect, that there was nothing that was put forth here to indicate that Mr. Roberts stalked [R.M.], that he caused her to be intoxicated, that he even approached

her first. There's no evidence to say that's the way it happened; in fact,
it was the other way.

Ex. 4 at 481. Trial counsel did not call Roberts "the big bad wolf"—counsel argued

that the jury should *not* view Roberts the way the prosecution portrayed him. Trial

counsel's comment did not provide a viable basis for appellate counsel to argue that

counsel was ineffective.

Roberts claimed in his state habeas petition that appellate counsel should have

challenged, as ineffective assistance, a comment trial counsel made during direct

examination. Roberts alleged: "On direct examination of defendant, trial counsel

made a comment such as (defendant's story sounded like it was from a movie.) Trial

counsel attacked his own client's credibility." Ex. 22 at 13. Roberts, however,

provided the First DCA with no citation to the record to support this allegation. The

First DCA reasonably could have concluded that appellate counsel was not

ineffective for failing to raise a claim that had no record support. *See* Ex. 3 at 346-

79 (Roberts's Direct Examination).

In short, Roberts fails to show that the First DCA's rejection of his claim was

contrary to, or involved an unreasonable application of, *Strickland*'s highly

deferential standard. Roberts is not entitled to habeas relief on Ground Eight.

**Ground Nine**    **"Ineffective Assistance of Appellate Counsel for Failing to Raise Trial Counsel's Ineffectiveness on Direct Appeal for Failing to Properly Motion for Judgment of Acquittal. The Evidence Was Insufficient as a Matter of Law to Establish One or More Essential Elements of the Charged Offense." Doc. 1 at 11.**

Roberts's final claim is that his appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective for "failing to properly motion for judgment of acquittal." Doc. 1 at 14. Roberts does not explain why trial counsel's motion for a JOA was not "proper." In his state habeas petition, Roberts asserted that trial counsel failed to argue that there was insufficient evidence of the "threat of force or violence element." Ex. 22 at 8.

The State asserts that Roberts is not entitled to habeas relief because he fails to satisfy § 2254(d)(1)'s demanding standard. Doc. 16 at 75.

### A.    *The State Court's Decision*

Roberts raised this claim in his state habeas petition as "Ground One." Ex. 22. The First DCA denied relief as outlined above. *See* Ground Six, *supra*.

### B.    *Roberts Is Not Entitled to Habeas Relief*

Based on the trial transcript, the First DCA reasonably could have determined that the State presented sufficient direct and circumstantial evidence that (1) Roberts sexually battered R.M. by threatening to use force or violence likely to cause serious personal injury, and (2) R.M. reasonably believed that Roberts could execute that

threat. That evidence is outlined in the Factual Background section of this Report and Recommendation. *See* Part I, *supra*. Given the State's evidence, the First DCA reasonably could have concluded that Roberts's proposed IATC claim was meritless and, therefore, that appellate counsel was not ineffective for failing to raise it. *See Tuomi*, 980 F.3d at 797-98; *Chandler*, 240 F.3d at 917; *Freeman*, 536 F.3d at 1233. Roberts is not entitled to habeas relief on Ground Nine.

## IV.    ROBERTS'S "MOTION FOR JUDICIAL NOTICE" SHOULD BE DENIED

Roberts has filed a "Motion for Judicial Notice" which, in substance, is a motion to supplement the record. Doc. 20. Roberts asserts that the record in this case is "incomplete" because it does not contain "the audio recordings to accurately reflect what transpired at trial." *Id*. at 3. Roberts asks the District Court to supplement the record by ordering that the audio recordings be produced, made available to the parties, and considered in reviewing Roberts's habeas claims. *Id*. at 3.

Roberts's motion to supplement the record should be denied. Each of Roberts's claims is either (1) procedurally defaulted, or (2) subject to review under § 2254(d)'s deferential standard. "Review of factual determinations under § 2254(d)(2) is expressly limited to 'the evidence presented in the State court proceeding.'" *Shoop v. Twyford*, 596 U.S. ___, 142 S. Ct. 2037, 2043 (2022). Similarly, "review under § 2254(d)(1) is limited to the record that was before the

state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

"Evidence later introduced in federal court is irrelevant to § 2254(d)(1) review."

*Pinholster*, 563 U.S. at 184; *see also id.* at 185 ("[E]vidence introduced in federal

court has no bearing on § 2254(d)(1) review.").

Because this court has determined—for those claims that are not procedurally

defaulted—that Roberts failed to overcome § 2254(d)'s demanding standard, there

is no purpose for this court to consider Roberts's additional evidence, or to

supplement or expand the record to include it. *See Williams*, 529 U.S. at 444.

Roberts's "Motion for Judicial Notice," therefore, should be denied.

## V.  A CERTIFICATE OF APPEALABILITY IS NOT WARRANTED

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States

District Courts provides: "[t]he district court must issue or deny a certificate of

appealability when it enters a final order adverse to the applicant." If a certificate is

issued, "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a). A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.

*See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has

made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537

U.S. at 336 (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. 100, 115 (2017) (quoting *Miller-El*, 537 U.S. at 327). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added). Here, Petitioner has not made the requisite demonstration. Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." 28 U.S.C. § 2254 Rule 11(a). If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

## VI. CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.     The petition for writ of habeas corpus, Doc. 1, challenging the judgment of conviction and sentence in *State of Florida v. Jarrod Nicolas Roberts*, Alachua County Circuit Court Case No. 2015-CF-001165, be **DENIED**.

2.     Petitioner's "Motion for Judicial Notice," Doc. 20, be **DENIED**.

3.     The District Court **DENY** a certificate of appealability.

4.     The clerk of court close this case file.

At Pensacola, Florida, this <u>7th</u> day of April, 2023.

<u>/s/ *Michael J. Frank*</u>
**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**